# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-298-RDM** |
| **ZACH RASH,** | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Zach Rash to 30 months of incarceration, three years of supervised release, $2,000 in restitution, and a $100 mandatory special assessment for his felony conviction. The requested 30-month prison sentence is at the top of the 24-30 month Sentencing Guidelines range agreed to by the government and Rash as part of his plea, and balances the factors articulated in 18 U.S.C. § 3553.

## I.     INTRODUCTION

Zach Rash, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Rash first appeared on the Lower West Terrace, holding a fire extinguisher, with the initial wave of rioters to overtake this location around 2:30 p.m. He moved directly to the Inauguration Tunnel Entrance ("Tunnel") – the site of some of the most violent assaults against police officers on January 6, 2021. As one of the first rioters in the Tunnel, Rash waived and encouraged other rioters to join him. He moved around the Tunnel, where he participated in several coordinated pushes against law enforcement. Rash also grabbed a stun gun from another rioter, checked its functionality, and assaulted officers with the stun gun twice before passing the stun gun to another rioter.

From here, Rash departed the Tunnel. Immediately outside the Tunnel he led and participated in numerous chants on the Lower West Terrace, encouraging the ongoing violence around him. Rash returned to the Tunnel several minutes later. After directing and encouraging rioters in the Tunnel, he secured a vantage point above other rioters near the front of the mob. In this location, Rash observed the ongoing violence and, at one point, passed a police riot shield away from officers and to rioters at the back of the Tunnel. From his perch above the mob, Rash jumped forward, then joined several rioters in wrestling with officers over a door leading into the Capitol. Officers were attempting to close this door to protect themselves and prevent rioters from gaining access to the Capitol. Unfortunately, Rash and other rioters successfully prevented officers

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

from closing and securing this doorway, thereby facilitating continued assaults against officers in the Tunnel.

The government recommends that the Court sentence Rash to 30 months of incarceration. A 30-month sentence reflects the gravity of Rash's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 19, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Rash's Role in the January 6, 2021 Attack on the Capitol

In the days preceding January 6, 2021, Zach Rash traveled from Utah to Washington, D.C., to attend the former president's rally. Following the rally, Rash walked to the United States Capitol, eventually arriving at the West Plaza. On the West Plaza, Rash approached a police line established by officers to prevent the developing mob from advancing on the Capitol.

At approximately 2:28 p.m., the police line on the West Plaza collapsed after rioters successfully overcame officers, forcing officers to retreat. After this breach, Rash, carrying a fire extinguisher, moved to the Lower West Terrace as an initial rioter to overtake this location.



*Image 1: Rash carrying a fire extinguisher after the police line broke at approximately 2:40 p.m.*

Rash moved toward the Tunnel on the Lower West Terrace. Rash initially entered the Tunnel at approximately 2:50 p.m. and immediately moved to the front of the mob where rioters assaulted law enforcement. For the next few minutes, Rash moved to different locations inside the Tunnel and, at one point, waived to other rioters on the Lower West Terrace to join the chaotic scene.



*Image 2: Rash waving rioters to the Tunnel.*

At approximately 2:53 p.m., another rioter, Bryan Smith, removed a stun gun from his pocket and tested the stun gun to ensure it worked while Rash stood several feet to his right.[2]

---

[2] This Court convicted Bryan Smith of numerous offenses related to his conduct at the Capitol on January 6, 2021, in *United States v. Bryan Smith,* 23-cr-71. This Court scheduled Smith's sentencing for November 15, 2024.



*Image 3: Smith (circled in green) holding and spark testing the stun gun (circled in red) before handing it to Rash (circled in yellow).*

After Smith ensured the stun gun worked properly, Smith waived the stun gun and offered it to other rioters in front of him. Rash reached for the stun gun and took it from Smith.



*Image 4: Rash (circled in yellow) grabbing the stun gun from Smith (circled in red).*

6

After receiving the stun gun, Rash immediately turned towards the wall in the Tunnel and inspected the stun gun in his hand. At approximately 2:53 p.m., and seconds after receiving it, Rash lunged toward officers and activated the stun gun. Approximately 20 seconds later, Rash lunged at officers again with the stun gun.

At approximately 2:54 p.m., Rash passed the stun gun to another rioter and exited the Tunnel.[3] This rioter handed the stun gun to another rioter who retained the stun gun and used it against other officers defending the Capitol.[4]

After Rash left the Tunnel, Rash encouraged rioters to enter the Tunnel and join the ongoing melee. He remained near the Tunnel entrance for several minutes observing the chaotic scene around him and chanting "Whose House, our House!" with other rioters.



*Image 5: Rash (circled) pumping his fist and chanting at the mouth of the Tunnel after assaulting officers with the stun gun.*

---

[3] This rioter is Michael Asbury. Asbury pled guilty to crimes for his conduct at the Capitol on January 6, 2021. *See United States v. Michael Asbury,* 23-cr-236.

[4] This rioter is Vitali Gossjankowski. A jury convicted Gossjankowski of numerous crimes for his conduct at the Capitol on January 6, 2021. *See United States v. Vitali Gossjankowski*, 21-cr-123.

At approximately 2:57 p.m., Rash entered the tunnel again. He made his way to the front of the mob and joined a coordinated "Heave-Ho" push by rioters against officers. At certain points in this push, Rash yelled at other rioters, encouraging and directing their actions. At approximately 3:00 p.m., Rash climbed above other rioters to secure a view of the ongoing assaults against officers. From this position, and after rioters stole a police shield from an officer defending the Tunnel, Rash helped pass the shield to the back of the mob.



*Image 6: Rash passing a police shield in the Tunnel.*

From here, Rash jumped forward to a position at the front of the mob. There, he joined another coordinated push by rioters at 3:03 p.m. Rash and other rioters struggled with officers to keep a door leading to the Capitol interior open. Rash and other rioters successfully overcame officer's efforts to close the door.



*Image 7: Rash (circled in yellow) struggling with officers over a door (circled in Green) in the Tunnel.*

Rash stayed at this location for nearly 10 minutes and departed the Tunnel at approximately 3:15 p.m. He remained on the Lower West Terrace with the mob before departing the Capitol.

### *Rash's Statement to the FBI*

On October 5, 2022, Rash submitted to an interview with the FBI. In this interview, Rash told the FBI that he received a stun gun in the Tunnel. Rash acknowledged holding the stun gun for several minutes but advised he "dropped it and didn't want anything to do with it." In response to further questions about the stun gun, Rash equivocated on whether he assaulted officers with the stun gun in the Tunnel. He stated, "I don't think I used it that day" but "it could have happened." These statements were false, as Rash acknowledged when he pleaded guilty.

## III.    THE CHARGES AND PLEA AGREEMENT

On June 21, 2024, the government filed an information charging Rash with one count of violating 18 U.S.C. § 111(a) – assaulting, resisting, or impeding certain officers. On July 15, 2024,

Rash was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Rash now faces sentencing on 18 U.S.C. §111(a)(1), assaulting, resisting, or impeding certain officers or employees.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Rash faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The parties agree that the following Sentencing Guidelines sections apply:

Count One: 18 U.S.C. § 111(a)(1)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) & (b) | Official Victim | +6 |
| | **Total** | **20** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1(a) & (b)) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

*See* ECF 18 ("Plea Agreement") at 2-3.

---

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

The U.S. Probation Office agrees with both the Chapter Two Guidelines section (U.S.S.G. § 2A2.2) and the Chapter Three adjustments (U.S.S.G. § 3A1.2(a) & (b) and U.S.S.G. § 3E1.1(a) & (b)) applied above.[6]  PSR ¶¶ 40, 42, 46, and 47.   Probation also agrees with the parties that Rash is not eligible for an adjustment pursuant to U.S.S.G. § 4C1.1 because Rash used violence or credible threats of violence in connection with the offense, in contravention of U.S.S.G. 4C1.1(a)(3). *See* PSR ¶ 48; Plea Agreement at 3.

The U.S. Probation Office calculated Rash's criminal history as category I, which is not disputed. PSR ¶ 56; Plea Agreement at 3. Accordingly, based on the parties' calculation of Rash's total adjusted offense level, after acceptance of responsibility, at 17, Rash's Guidelines range is 24 to 30 months' imprisonment.

---

[6] Probation also added the specific offense characteristic for use a deadly or dangerous weapon under U.S.S.G. § 2A2.2(b)(2)(B), which resulted in Probation calculating a total adjusted offense level of 21 instead of 17.   PSR ¶¶ 41, 45, 21. Pursuant to the Plea Agreement, "[t]he parties… reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein."   Plea Agreement at 5.   Accordingly, the government acknowledges that Probation's guidelines calculation are correct given Rash's actions with the stun gun on January 6, 2021.   However, the parties' plea agreement did not contemplate the inclusion of an enhancement for use of a deadly or dangerous weapon under U.S.S.G. § 2A2.2(b)(2)(B), and the parties' agreed-upon total adjusted offense level was 17, which would result in a Guidelines range of 24-30 months, assuming a Criminal History Category of I (as is true here). *See* Plea Agreement at 3. The government believes in the fairness of the plea agreement and advocates for a recommendation – 30 months of incarceration – that is within the advisory Guidelines range in the plea agreement (and that *does not* include the dangerous weapon enhancement).   The government believes that this sentence within the agreed-upon Guideline range is sufficient to achieve statutory goals and appropriate in the instant case.

11

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Rash's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. At the Tunnel, the site of some of the most intense violence on January 6, 2021, Rash assaulted officers on several occasions, including with a stun gun. He stayed in the Tunnel for a significant period, preventing officers from closing a door that would have prevented continued assaults by rioters. To illustrate what the officers faced, an officer in the Tunnel with Rash described being "poked with a cattle prod" and being sprayed with chemical irritants, eventually causing the officer to vomit.[7]

This Court addressed the seriousness of using a stun gun against officers on January 6, 2021, in the related case, *United States v. Bryan Smith*, 23-cr-71.[8] ("And everyone here agrees that when the VTS797 is fired, it emits a very loud and scary electrical shock-type noise that one typically associates with a Taser-like device. And an officer hearing that device, in my view, would

---

[7] The Government identified another rioter in the Tunnel adjacent to Rash who also used a stun gun against officers around the same time Rash lunged toward officers with the stun gun. It is possible the other rioter stuck this officer, not Rash. Therefore, the government does not offer this officer's characterization as a victim of Rash's assault, but rather to illustrate the dangers posed by various weapons used against officers in the Tunnel, including stun guns.

[8] This Court has scheduled sentencing in *United States v. Bryan Smith* for November 15, 2024.

be concerned about their physical safety, particularly when it is pointed in their direction in the middle of a riot as occurred here. Sergeant Bogner testified that despite all of the noise and commotion that was occurring in the tunnel that day, he and other officers in the tunnel were able to discern the noise from a stun gun being discharged like the VTS797, []. And when you know that sound, you know it to be a weapon. And it is something you pay attention to. Sergeant Bogner elaborated by stating that a stun gun presents safety concerns, because a stun gun can hurt you. It can cause pain. It can cause burns. It is something you pay attention to because you don't want it used on you.") Tr. Tran, 5-10-24 at 76 (internal quotations omitted).

This Court continued to address the particularly aggravating characteristics of the stun gun in *Smith* that Rash used on January 6, 2021. ("I will say, because this doesn't come across in the record, but when you hear the device fire, it is frightening. And I understand that there was a lot of noise in the tunnel, but it is extremely loud and an extremely disturbing noise. And I know that I personally jumped when I heard the device.") Tr. Tran, 5-10-24, at 76.

Therefore, the nature and circumstances of Rash's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 30 months of incarceration followed by three years of supervised release.

**B.  The History and Characteristics of Rash**

Rash is a 25-year-old independent contractor. PSR ¶ 80. Rash is one of seven siblings and had a positive childhood in Utah with his parents. PSR ¶ 60. The PSR provides ample evidence of Rash's positive background and stable lifestyle. PSR ¶ 57-77. Rash has no documented encounters with law enforcement and his criminal history is I. PSR ¶ 52. There is nothing in Rash's

background that would explain why he behaved this way, nor that justifies, excuses, or mitigates his conduct. Yet, not only did Rash go to the Riot, but he also went to the front of one of the worst, most dangerous areas and joined the assaults against officers. And as opposed to many crimes generally, the criminal offenses of January 6 were not crimes of passion, desperation, or opportunity: they were ideologically motivated crimes. In these circumstances, the absence of a criminal background does not lessen Rash's propensity to commit this type of offense again, should similar circumstances present themselves.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rash's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

Rash's actions on January 6, 2021, were surprising given his upbringing, background, and

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

lifestyle. He had the competencies and support system to know better. The lack of mitigating factors in Rash's life that would have led him down this dark path is particularly aggravating.

Despite his lack of prior criminal history, Rash made the fraught decision to participate in the Capitol riot on January 6, 2021; his participation was significant. Although he was in a sea of chaos, Rash's actions stood out within the mob for his commitment to disorder and violence. He climbed to the Lower West Terrace with a fire extinguisher. He moved directly to the front lines where he invited others to join him in assaults against officers. On two distinct occurrences, he used a stun gun he grabbed from another rioter to assault officers. He cavalierly passed the same stun gun to another rioter, knowing it would likely be used again on a police officer.

After he initially departed the Tunnel and participated in a "Whose House, our House!" chant, he returned for more action. After he returned, he barked orders to those around him. He climbed above the mob and jumped forward and pried a critical door away from officers. He held this door open as other rioters ruthlessly attacked officers in the Tunnel with a range of makeshift weaponry. In past January 6 cases, officers have testified to the importance of closing the doors Rash held open. *See U.S. v. Cappucio et al.,* 21-cr-40-TNM, ("But if we could get those outer doors closed, they have the ability to lock. But they also had handles where you could maybe even put handcuffs on them or something. But if we get those closed and can lock them, it would create like – it would create a funnel where the rioters would have to come through a funnel, which is much easier to defend than, you know, a 15- or 20-foot hallway, if you're only dealing with a 2-foot door. It's much easier to defend.") Tr. Tran. at 351. Rash's actions enabled continued assaults against officers and exposed officers to significant danger.

In a subsequent interview with the FBI on October 5, 2022, Rash offered the FBI a false and misleading narrative concerning his actions on January 6, 2021, specifically in reference to his use of a stun gun in the Tunnel. He told the FBI he "dropped" the stun gun and "didn't want anything to do with it." This was false. He also told this FBI, "I don't think I used it that day." This was also false. Rash assaulted officers with the stun gun on two occurrences and handed the stun gun to another rioter as he left the Tunnel. This rioter passed the stun gun to another rioter who used it to assault officers. Therefore, the severity of Rash's actions warrant a substantial term of incarceration to deter Rash going forward.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[11] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Judges, including this Court, have sentenced defendants to significant periods of incarceration for assaulting officers with a stun gun at the Capitol on January 6, 2021. *See e.g. United States v. Alan Byerly*, 21-cr-527. This Court sentenced Byerly to 34 months for numerous assaults on January 6, 2021, including using what appeared to be a stun gun against officers.[12] During the sentencing hearing, this Court articulated the aggravating circumstances posed by such

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[12] Both Rash and Byerly engaged in other troubling conduct, aside from assaulting officers with a stun gun. In Byerly's case, he pushed a reporter.

a device against officers on January 6, 2021. ("[] I think that the police officers quite reasonably, [], s[aw] this as a functioning stun gun because of the sound that it emitted, and they clearly thought it was a stun gun and they were clearly frightened by it. And it distracted them from the discharge of their responsibilities to protect the Capitol while they dealt with Mr. Byerly. And it undoubtedly added to the fear that the officers encountered that day. And when you just listen to the video, and the noise level on it, [], just the noise that was taking place that day and the anger in that crowd, it's very hard to imagine being in that position in which you are one of the people who is there trying to protect the Capitol and there is an assault on your nation and an assault on you and a very large crowd. And to have somebody come at you with a device that appears to be a stun gun is undoubtedly a very frightening thing to happen.") Sent. Tr. at 63.

But Rash's use of a stun gun was only part of his criminal activity on January 6, 2021. *United States v. James Weeks*, 24-cr-131 (BAH), offers the Court a useful comparator for Rash's decision to hold open a door in the Tunnel. Weeks pled guilty to one Count of 18 U.S.C. § 111(a)(1) for his actions in the Tunnel. Weeks, like Rash, held open one of the doors in the Tunnel. Judge Howell concluded that Weeks' opening one of the doors in the Tunnel was aggravating because it facilitated continued assaults on police and characterized it as "extraordinarily serious." On October 4, 2024, Judge Howell sentenced Weeks to 27 months' incarceration and 36 months of supervised release.[13]

---

[13] The Government has requested, but not received, the sentencing transcript in this case because the sentencing hearing recently occurred on October 4, 2024.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[14] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Rash must pay $2,000 in restitution, which reflects in part the role Rash played in the riot on January 6.[15] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Rash's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 120.

## VIII.    FINE

Rash's convictions for violations of 18 U.S.C. 111(a)(1) subject him to a statutory maximum fine of 250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Rash's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Rash's financial assets set forth in the PSR suggest that while Rash has a positive net worth and limited positive monthly cash flow, Rash is unable, and is unlikely to become able, to pay a fine, in addition to restitution. *See* PSR ¶ 98.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months of incarceration, three years of supervised release, $2000 in restitution, and a $100 mandatory special assessment for his felony conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    /s/ Eli J. Ross
       Eli Ross
       Assistant United States Attorney
       Bar No. IL 6321411
       U.S. Attorney's Office for the District of Columbia
       601 D Street, N.W.
       Washington, D.C. 20530
       Phone: (202) 297-1515
       Email: Eli.Ross@usdoj.gov

       /s/ Sara E. Levine
       Sara E. Levine
       Assistant United States Attorney
       VA Bar No. 98972
       U.S. Attorney's Office for the District of Columbia
       601 D Street, N.W.
       Washington, D.C. 20530
       Phone: (202) 252-1793
       Email: Sara.Levine@usdoj.gov